# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NICBYTE LLC, NIC WISE RE LLC, 1701 18TH STREET, LLC, 1715 18TH STREET, LLC, 1723 18TH STREET, LLC, and 747 R STREET, LLC,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>STARTOP INVESTMENTS, LLC,<br><br>Defendant/Counterclaim Plaintiff,<br><br>and<br><br>WISHON ROW, LLC, BW INDUSTRIES INC., and BITWISE INDUSTRIES, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2023-0637-NAC |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: June 18, 2025
Date Decided: April 8, 2026

Richard L. Renck, Brandon R. Harper, DUANE MORRIS LLP, Wilmington, Delaware; Stephen H. Sutro, Suzanne R. Fogarty, DUANE MORRIS LLP, San Francisco, California; *Counsel for Plaintiffs/Counterclaim Defendants NICbyte LLC, NIC Wise RE LLC, 1701 18th Street, LLC, 1715 18th Street, LLC, 1723 18th Street, LLC, and 747 R Street, LLC.*

Neil R. Lapinski, Phillip A. Giordano, Madeline R. Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for Defendant/Counterclaim Plaintiff StarTop Investments, LLC.*

Marc S. Casarino, Katie Barksdale, KENNEDYS CMK LLP, Wilmington, Delaware; *Counsel for Defendants Wishon Row, LLC, BW Industries Inc. and Bitwise Industries Inc.*

**COOK, V.C.**

One might say that trial is, in some ways, like an archaeological dig. Similar to a fact-finder, an archaeologist is tasked with piecing together what exists from a record that naturally degrades over time. But a spoliated record presents added challenges, and at the risk of over-extending the analogy, is like coming across a robbed grave or natural disaster site—only some scattered bones and bare foundations remain. What, then, is a court to do, particularly when the spoliation also concerns fraud and attendant misrepresentations and forgeries?

This post-trial opinion addresses the defendant's efforts to enforce claimed security interests over property owned indirectly by the plaintiffs when the loan documentation giving rise to the security interests was the work of a rogue manager engaged in fraud and known to be a rogue manager by the defendant and its principals. Before trial, this Court found that the defendant, through its principals, engaged in the spoliation of evidence, deleting thousands of documents, including text messages, emails, and data room documents. The Court found that burden-shifting and an increase in the burden of proof on the defendant's counterclaims and defenses were appropriate as an initial remedy. The Court reserved decision on whether to impose more severe sanctions.

After a two-day trial, having examined all exhibits submitted and considered the testimony of all witnesses, the Court finds that the defendant intentionally destroyed evidence and, in doing so, severely prejudiced the plaintiffs. For the reasons discussed in this decision, the Court imposes, as a further sanction, an

adverse inference that the plaintiffs' agent did not have authority to enter into the loans and that the defendant knew it.

I thus find that the plaintiffs are entitled to an injunction against enforcement of the claimed security interests in the loans. I also address objections to the plaintiffs' Rule 88 affidavit regarding the spoliation motion.

## I. FACTUAL BACKGROUND[1]

The facts are drawn from the post-trial record, which includes 33 stipulations of fact, over 1,300 exhibits, and trial testimony from four witnesses. Having evaluated the credibility of the witnesses and weighed the evidence, the Court makes the following findings.

### A. Soberal and Hardcastle

In the fall of 2013, Jake Soberal reached out to David Hardcastle about a possible client engagement.[2] Soberal was the co-founder of Bitwise Industries Inc. ("Bitwise"), a company located in Fresno, California that provided technology training.[3] Bitwise is a wholly owned subsidiary of BW Industries Inc. ("BW

---

[1] Joint trial exhibits are cited as "JX ___," and trial testimony is cited as "TT___([Name])." Citations to PTO refer to the Amended Joint Pre-Trial Stipulation and Order. Dkt. 185.

[2] JX 1.

[3] TT 566:4–6 (McCormick); JX 1.

2

Industries"), a Delaware corporation.[4] Soberal and Irma Olguin Jr. were the co-CEOs of BW Industries and Bitwise.[5]

Soberal worked with Hardcastle on a website development project.[6] The "working relationship," however, ended in 2015 over a billing dispute, with both sides accusing each other of "dishonest[y] and unfair[ness]."[7] That exchange was a foreshadowing of events to come.

In 2022, Soberal moved into the same neighborhood as Hardcastle and lived around the corner.[8] Around that time Soberal asked Hardcastle for a short-term loan to Bitwise.

## B. The Unsecured Loans

Soberal pitched to Hardcastle the need for an unsecured $1 million bridge loan, claiming that Bitwise was in the final stages of selling a third of his company.[9] Soberal represented that although Bitwise had a minimum of $40 million in cash, it

---

[4] PTO ¶¶ 10, 11. For simplicity, I refer to Bitwise and BW Industries collectively as "Bitwise" unless specificity is required.

[5] *Id.* ¶ 12.

[6] TT 12:10–12 (Hardcastle).

[7] JX 5 at 3 (Soberal emailing Hardcastle that, "[a]s I mentioned in our phone conversation, I strongly disagree with your conclusion and believe that you and your team are being dishonest and unfair in our efforts to resolve this billing inquiry"); *id.* at 2 (Hardcastle emailing Soberal that, "[w]hat I do know though after my audit with regards to our original agreement and what has been paid and what has been delivered, that's not dishonest or unfair, that's black and white. If you don't make good on that, that would be the definition of unfair and dishonest").

[8] TT 13:1–6 (Hardcastle).

[9] JX 39.

3

could not service any capital or real estate needs until the purported deal closed.[10] He needed the loan in two days, and offered a ten percent "loan fee" on a 90-day term.[11]

Hardcastle loaned nearly half the amount.[12] He solicited investors for the rest.[13] He conveyed the same story he heard from Soberal—that Bitwise could not use its own cash for capital expenditures and real estate spending and was in need of a bridge loan.[14]

On May 30, 2022, Soberal sent an executed note to 2112 LLC ("2112"), a company owned by Hardcastle ("First 2112 Loan").[15] The note was for $1 million in principal with a "fixed loan fee" of $100,000 due on August 29, 2022.[16] Hardcastle received a two percent marketing fee of $20,000.[17]

---

[10] *Id.*

[11] *Id.*

[12] TT 21:1–6 (Hardcastle). Hardcastle loaned the money through one of his companies, HGM Holdings, LLC. TT 20:21–21:7 (Hardcastle). This loan was later consolidated into the 2112 loan. TT 205:16–19 (Hardcastle).

[13] JX 38, 40.

[14] *See* JX 67.

[15] PTO ¶ 17; JX 48.

[16] JX 48.

[17] The other loan documents included a guaranty agreement and side letter. *Id.* Hardcastle specifically requested that his marketing fee not be documented on the note, but instead in a side letter. JX 51. ("Leave the 2% marketing fee off the note."). BW Industries signed as both the borrower and the guarantor. JX 48.

Soberal soon needed more cash. On June 7, Hardcastle made another loan on similar terms as the first ("Second 2112 Loan").[18] It was due three months later.[19] Hardcastle received another two percent marketing fee.[20]

In structuring these loans, Hardcastle, through 2112, received funds from investors and then made the loan to Bitwise.[21] This arrangement limited the visibility investors had into Soberal. Going forward, Hardcastle continued this intermediary role between Soberal and investors.

## C. Bitwise and NICbyte form NIC Wise

In the same month, Soberal was negotiating a sale-leaseback transaction with Plaintiff NICbyte LLC ("NICbyte"). On June 6, 2022, NICbyte and Wishon Row LLC ("Wishon Row") created a joint venture entity called NIC Wise RE LLC, a Delaware limited liability company ("NIC Wise").[22] Under the limited liability company agreement governing NIC Wise ("JVA"), NICbyte owned 95 percent of the membership interests, contributing approximately $35.5 million.[23] Wishon Row

---

[18] JX 64.

[19] *Id.*

[20] *Id.*

[21] TT 35:11–15 (Hardcastle) ("I just did a note between 2112 and the lender and then just did a note between 2112 to Bitwise."). Investors referenced above participated via a loan participation agreement. *See, e.g.*, JX 278. The decision refers to them as investors for ease of reference.

[22] PTO ¶¶ 1, 2, 14.

[23] JX 95 ("JVA"), Ex. A. and Schedule 2.3.

5

owned the other five percent.[24] BW Industries wholly owned and managed Wishon Row.[25]

The parties entered into the JVA as part of a transaction involving the sale and lease of real estate.[26] The relevant properties included three properties in Bakersfield, and another in Fresno, California (respectively, the "Bakersfield Properties," and "Fresno Property").[27] BW Industries sold these real estate properties to wholly owned subsidiaries of NIC Wise for approximately $32.5 million.[28] NIC Wise then leased the properties back.[29] This allowed Bitwise to unlock capital assets from the sale proceeds while retaining use of the properties.[30]

Wishon Row had restricted responsibility for managing NIC Wise's business and affairs under the JVA.[31] Unless Wishon Row obtained the consent of NICbyte, the JVA prohibited Wishon Row from (a) obtaining any financing, (b) pledging or transferring any interest in or granting an encumbrance on any of the real estate

---

[24] PTO ¶¶ 1, 9; JVA.

[25] PTO ¶ 11.

[26] TT 513:3–10 (McCormick).

[27] *See* JVA Art. 1.

[28] JVA, Ex. A and Schedule 2.3; *see, e.g.*, JX 96, 97; TT 513:3–10 (McCormick). The relevant wholly owned subsidiaries were 747 R Street LLC, 1701 18th Street LLC, 1715 18th Street, LLC, and 1723 18th Street, LLC. PTO ¶¶ 3–6.

[29] *See, e.g.*, JX 96, 97; TT 513:3–10 (McCormick).

[30] *See* Carla Tardi, *Leaseback (or Sale-Leaseback): Definition, Benefits, and Examples*, Investopedia (last updated August 8, 2025), https://www.investopedia.com/terms/l/leaseback.asp.

[31] *See* JVA Art. 6.

6

properties, or (c) granting a security interest in the membership interests or other

Company assets.[32] Any unauthorized transfer, assignment or other disposition of a

member's "right, title or interest in the Company," or encumbrance, hypothecation,

or pledge of such right, title or interest would be deemed "void and ineffective."[33] The

JVA further provided that:

> [n]othing herein contained shall impose any obligation on any Person or firm doing business with the Company to inquire as to whether or not the Manager has exceeded its authority in executing any contract, agreement, lease, mortgage, note, guaranty, loan agreement, pledge, security agreement or other evidence of indebtedness, deed, assignment, conveyance or other transfer instrument or any other document or instrument of any kind or nature (each, a "Contract") on behalf of the Company, and any third person shall be fully protected in relying upon Manager's confirmation of such authority.[34]

## D. Soberal Encumbers the Fresno Property and Extends the New Loan

A few weeks from the due date of the First 2112 Loan, Soberal reached out to

Hardcastle for another $1 million, offering to secure the loan with the Fresno

Property.[35] But Soberal did not want the security interest recorded—proposing to

Hardcastle that they utilize a "springing deed of trust" with first lien priority.[36] As

mentioned above, the JVA prohibited Soberal from encumbering the real estate

properties without NICbyte's consent. By not recording the deed of trust, Soberal

---

[32] JVA § 6.5(a)(i), (ii), (iv), (v).

[33] JVA § 9.1.

[34] JVA § 6.1.

[35] JX 258.

[36] *Id.*

7

could conceal the transaction from NICbyte. The limited record suggests that Soberal did not explain his need for the deed of trust to go unrecorded, and Hardcastle did not ask any questions, except as to the fee amount.[37]

As with the First 2112 Loan on May 30 and the Second 2112 Loan on June 7 2022, Soberal's request was made on short-notice—he purportedly needed to submit a purchase order for equipment "by tomorrow" and "prefer[red] not to use [the] balance sheet."[38] Ignoring these red flags, Hardcastle told Andrew Adler, his business partner at StarTop Investments, LLC ("StarTop"),[39] to "[c]heck slack, just sent you a loan deal that is juicy."[40] Because Hardcastle and Adler deleted their Slack messages, the Court has no record of what Hardcastle shared with Adler.

Adler initially opposed the idea of not recording the deed of trust. He preferred to structure the transaction as a "repo loan," so that in a "best case scenario" they could foreclose on the property in the event of a default within the 30-day term.[41] StarTop has not produced any other internal communications shedding light on why Hardcastle did not proceed with that option.

Hardcastle soon closed on this third loan to Bitwise. On August 26, 2022, Hardcastle loaned another $1 million, secured by an unrecorded deed of trust, on a

---

[37] *Id.*

[38] *Id.*

[39] PTO ¶ 8.

[40] JX 259.

[41] JX 262.

8

30-day term, with a "fixed loan fee" of $60,000 ("Third 2112 Loan").[42] The due date on the loan was September 30, 2022, unless "extended by agreement."[43] Hardcastle received a $30,000 marketing fee as documented in a separate side letter.[44] After receiving the Third 2112 Loan, Soberal paid off the First and Second 2112 Loans on September 7, 2022.[45]

Ten days before the Third 2112 Loan was due, Hardcastle agreed to Soberal's request to extend the due date for another two or three months.[46] Apart from the payment of fees, StarTop has not produced any other recorded communications between Adler and Hardcastle shedding light on Hardcastle's choice to extend the loan as opposed to collecting on the debt in the event of a default, as Adler initially suggested.

### E. Patrick Investments Loan

The communications in the record among Soberal and StarTop's principals become sparse for the next month and a half.[47] They pick up again on November 13,

---

[42] JX 275 ("While the Deed of Trust is upon execution enforceable, Beneficiary covenants that it shall only record this Deed of Trust in the event of an uncured default under the Note or this Deed of Trust.").

[43] JX 278.

[44] JX 275.

[45] JX 299.

[46] JX 317.

[47] *See, e.g.*, JX 335 (September 30, 2022 text between Hardcastle and Adler), JX 378 (October 13, 2022 email from Soberal to Hardcastle), JX 393 (November 13, 2022 text from Soberal to Hardcastle).

2022, when Soberal makes a request to Hardcastle for another loan.[48]  Hardcastle in turn began soliciting interest, which led to discussions with Patrick Investments LLC ("Patrick Investments").[49]  The "springing" deed of trust became a sticking point.

Patrick Investments flagged a clause in the draft documents that 2112 would not record a deed of trust unless there was a default.[50]  Soberal pushed back, telling Hardcastle that recording the deed of trust would "complicate things on our end."[51]  Soberal wanted Hardcastle to "[p]lease keep [him] posted on the issue of recording," and that the "pricing [was] very high for an over secured, recorded position."[52]  Hardcastle responded with a thumbs up emoji.[53]

Hardcastle told Patrick Investments that recording the lien on any properties would "add complexity" to another purported deal involving the sale of the properties that Soberal was working on.[54]  He reiterated Soberal's desire to not record the deed, and that Soberal would add another property as collateral in exchange for the condition to not record.[55]  He also sent draft documents for Patrick Investments' legal

---

[48] JX 393.

[49] *See, e.g.*, JX 405, 406.

[50] JX 417.

[51] JX 418.

[52] *Id.*

[53] *Id.*

[54] JX 419.

[55] *Id.*

10

team to review. This was the second instance in which Hardcastle or Adler were aware of and agreed to an unrecorded springing deed of trust, the fairly obvious purpose of which was to keep the purported security interest secret.

The comments Hardcastle received back were alarming. Patrick Investments' attorney wrote that the drafts were the "worst legal documents I have ever encountered."[56] He "doubt[ed] whether they could be enforced" as written and gave a "sampling of the problems."[57] For example, the note contained incorrect references to the borrower as the payee, did not have a maturity date for the loan or a stated interest rate (only a monthly "loan fee"), and listed a borrower (BW Industries) that did not own the real estate property.[58] He raised concerns about the enforceability of an unrecorded deed of trust and warned that Soberal could sell the property without giving notice to Patrick Investments.[59] The attorney described the deal as "an unsecured handshake loan"[60] and advised "run[ning] away as fast as you can."[61]

Hardcastle did not heed the warning. Soberal revised the draft loan documents, and sent Hardcastle organizational entity documents that included the JVA to

---

[56] JX 434.

[57] *Id.*

[58] Although documents such as the 2112 loans reference "loan fees," it seems that the "fees" operated, for all intents and purposes, as high interest rates on short-term loans, with the characterization as "loan fees" perhaps intended to muddy the waters as to that reality.

[59] JX 434.

[60] *Id.*

[61] *Id.*

11

address concerns about the ownership of the property.[62] Hardcastle passed on Soberal's comments and included the organizational documents that Soberal sent.[63] Even with Soberal's revisions to the draft documents, Patrick Investments was not willing to proceed in light of its counsel's "strong[]" recommendation not to.[64]

Faced with resistance from Patrick Investments, Hardcastle told Soberal that he would have to record the deed of trust for the deal to go forward.[65] About fifteen minutes later, Hardcastle emailed Patrick Investments that he "spoke with [Soberal] and he's willing to record a deed of trust to get the deal done."[66]

On December 19, 2022, Patrick Investments agreed to loan $2.75 million at an interest rate of five percent per month on a 90-day term secured by a recorded deed of trust that reached the Bakersfield Properties ("Patrick Loan").[67] Hardcastle received a $55,000 marketing fee.[68]

To close on the loan, Soberal sent Patrick Investments organizational documents showing the line of ownership of the properties. The copy of the JVA that he forwarded, however, differed materially from the one Hardcastle sent a few weeks

---

[62] JVA 435, 439, 440.

[63] *See* JX 435, 446.

[64] JX 466.

[65] JX 475.

[66] JX 466.

[67] JX 525, PTO ¶ 22. On February 15, 2023, Soberal extended the Patrick Loan for an additional $1.5 million. JX 854.

[68] PTO ¶ 22.

12

prior.[69]  The prior version was 45 pages long, and correctly named NICbyte as a member.[70]  The new version was an entirely different document—running only five pages long and falsely listing Wishon Row as the sole member.[71]  Soberal included Hardcastle on the email.

Once the Patrick Loan closed, Soberal paid off two other loans Hardcastle and Adler had issued, through their investment vehicles, during negotiations with Patrick Investments.[72]  Soberal also paid extension and monthly loan fees on the Third 2112 Loan.[73]

Recognizing Soberal's insatiable need for liquidity and the fees extracted thus far, Adler next conceived of ways "to squeeze money out . . . on the participant side too."[74]  That opportunity came in the form of the first StarTop loan for $10 million. As Soberal's co-CEO Olguin noted to Soberal in a text, "[i]t's kind of funny, when you think of it.  Maybe we just need $10M every month to refinance the $10M we

---

[69] Compare JX 538 with JX 435.

[70] JX 435.

[71] JX 538.

[72] JX 468, 486, 491, 568.

[73] JX 452, 453, 568.

[74] JX 584.

borrowed the month before."[75]  Hardcastle made a related point to Adler: "[Soberal] always needs money.  I think we'll be making fees off BW for many months to come."[76]

## F. StarTop Engages in Fraud to Issue the First StarTop Loan

While Hardcastle was working on the Patrick Loan, he and Adler began soliciting investors for the $10 million loan.  Hardcastle and Adler represented to investors that it would be offered at a two percent monthly rate, or nominal 24 percent rate per annum.[77]

But that was an outright lie.  The term sheet that StarTop executed with Bitwise was actually documented at a five percent monthly rate, not two.[78]  The idea was that, with Bitwise paying a sky-high 60 percent nominal interest rate but StarTop's investors believing the rate was only 24 percent, Hardcastle and Adler could keep the delta and no one would be the wiser.  To conceal this, Adler fabricated the term sheet and promissory note.[79]  Adler further instructed Hardcastle to use the

---

[75] JX 574.

[76] JX 584.

[77] *See, e.g.*, JX 496, 1236; TT 390:9–391:14 (Adler).  In its motions in limine, StarTop argued that StarTop's representations as to the interest rate it charged on the underlying loan documents are without "probative value in this litigation" and should be excluded.  *See* Dkt. 127, Defendant StarTop Investment, LLC's Combined Response in Opposition to Plaintiffs' Motion for Sanctions and Motion in Limine to Bar Irrelevant and Extremely Prejudicial Testimony ¶ 41.  The Court denied the motion without prejudice with the opportunity to renew any objections in post-trial briefing.  *See* Dkt. 197 ("Transcript Ruling on Motion in Limine and Motion for Spoliation").  Having considered again StarTop's objections under Delaware Rules of Evidence ("D.R.E.") 401–403, as explained below, such representations are relevant to key questions in this action.

[78] JX 1223, 1233.

[79] JX 628, 723, 765, 769, 1233; TT 505:18–507:13 (Adler).

14

falsified promissory note if investors asked to see it.[80] Adler later deleted the falsified term sheet from the deal room during discovery in this action.[81]

Adler and Hardcastle also included terms in the loan that they expected Soberal would violate and that they had no intention of enforcing. Adler pointed out to Hardcastle that a use of funds clause was necessary to convince investors to participate because otherwise "everyone will assume [Soberal] will be using borrowed funds to pay back the high interest rate debt."[82] The limited, spoliated record that remains strongly suggests Hardcastle and Adler knew this was Soberal's modus operandi. When Soberal wanted the clause "updated" in the term sheet, Hardcastle told Soberal: "[D]on't worry about that. We can't tell where it's going anyway. Just for our lenders in case they ask."[83]

Adler and Hardcastle also received falsified organizational documents and board consents from Soberal. The organizational chart and board consents that Soberal sent falsely listed NIC Wise as wholly owned by Wishon Row.[84] These documents plainly contradicted the unadulterated JVA that Hardcastle had in his possession from negotiations with Patrick Investments. The board consent from BW

---

[80] JX 765.

[81] JX 1312 ¶ 37, 1223, 1182; TT 505:18–507:13 (Adler).

[82] JX 589.

[83] JX 591, 592.

[84] JX 590 at 47.

15

Industries made the same misrepresentations in the opening recitals.[85] In addition, on the signature audit trail for the purported BW Industries' board consent, Soberal redacted the lines for the IP address and email address next to each director's name to conceal that he electronically forged their signatures.[86] StarTop has produced no internal communications between Adler and Hardcastle concerning the authenticity of these documents.

On January 13, 2023, Bitwise issued a note to StarTop for $10 million at a monthly interest rate of five percent on a 12 month term.[87] The $10 million note was secured by a recorded deed of trust encumbering the interests of the entity that directly owned the Fresno Property.[88] Soberal signed a pledge agreement on behalf of NIC Wise, pledging its membership interests in the entity that directly owned the Fresno Property.[89] StarTop did not provide a true copy of the note to investors. As with the term sheet, Adler forged this document as well.[90]

---

[85] JX 694, 724.

[86] JX 694, 724. For the second StarTop loan, it appears Soberal omitted the audit trail altogether. *See* JX 933.

[87] JX 718.

[88] JX 806.

[89] JX 714.

[90] JX 723.

## G. StarTop Enlists Soberal's Help to Conceal Fraud

At the start of February 2023, Soberal began asking for $5 million on similar terms as the first StarTop loan.[91] But Adler recognized that continuing to loan Soberal money, even at the (false) annualized 24 percent interest rate, would prompt questions from investors. If their investors knew the true, and much higher, interest rate that they were charging, their fraudulent scheme would likely quickly unravel. Capturing this conundrum in a text to Hardcastle, Adler pointed out the risk that investors could start "asking bitwise why the hell are you borrowing at these rates . . . [w]hich btw we are lending even higher then [sic] 24%."[92] In an attempt to avoid this outcome, Adler initially proposed avoiding any direct contact between Soberal and the investors, offering to Hardcastle that "I will casually reiterate not to discuss with the borrower or employees of the borrower."[93] But Hardcastle had other ideas and wanted to include Soberal in a call with one of the potential investors.

Adler told Hardcastle that they needed to "prep" Soberal on "why he needs the $$/use of funds" and "[w]hy he is borrowing at these expensive rates (24% if they

---

[91] JX 810, 838.

[92] JX 827.

[93] *Id.*

17

ask)."[94]  Hardcastle replied that "[he'd] coach him up on it."[95]  About ten hours later, Hardcastle texted Adler, "[t]alked to [Soberal], he's ready to go."[96]

The call with the investor took place the same day, on February 24.[97]  With Soberal on the call, Hardcastle and Soberal offered fabricated reasons justifying the stated high-interest rate, while actively concealing the even higher true rate.  Soberal knew what the actual rate was but collaborated with Hardcastle and Adler in concealing the fraud.

---

[94] JX 868.

[95] *Id.*

[96] *Id.*

[97] *Id.*  Although Hardcastle's testimony was evasive, his testimony and Adler's, if anything, bolstered the finding of duplicity behind the call. *Compare* TT 345:4–8 (Hardcastle) ("Q: I don't remember exactly if it was being -- if he confirmed . . . that's what they were paying or if that's what they were going to receive, the 24 percent. I don't remember how that conversation went."), *with* TT 345:9–486:8 (Hardcastle) ("THE COURT: Well, I will put it to you, I, frankly, think you're lying to me right now. I think that it makes no sense why it is that Long Angle would ask Mr. Soberal the amount that a loan would be marketed to Long Angle as an investor in your firm. What it seems to me is that Long Angle would be inquiring of Mr. Soberal of the interest rate that his firm was paying on the loan. And they were very interested in understanding why he would be paying such a high interest rate because that would be very important to understand as part of their investment decision-making process. And the fact that Mr. Soberal told them a much lower rate than what was actually the rate on the loan would seem to be an extraordinarily material fact that was concealed and the subject of a false statement during that conversation with the specific intent to influence Long Angle's decision of whether or not to invest.  And you sat there and said nothing, knowing all of this. So I'm putting to you quite directly as to what it is that is my impression of all of this and of your testimony."). TT 289:23–290:7 (Hardcastle) ("A. He didn't say it in those words, but he said okay. Q. And, in fact, on the call, on the Zoom meeting with Long Angle, he said the loan was at 24 percent, didn't he? A. I think they asked, and he just confirmed that it was 24 percent."); TT 391:11–14 (Adler) ("But, yeah, it was confirmed to be at 24 percent. And we did represent to them that the loan was paying at 24 percent. That was a misrepresentation.").

18

Meanwhile, Bitwise started missing payment deadlines. On March 2, 2023, Bitwise was late on a monthly payment.[98] The explanation Soberal gave to Hardcastle, and that Hardcastle relayed to Adler, was that a lender had frozen Bitwise's accounts for a technical reason.[99] Adler responded: "if he knew he has this issue with his other lender was he bold face lying when he told you he set up the wire yesterday morning?"[100] In any event, Hardcastle agreed to cover a late payment to Soberal "so that our investors would never know the difference."[101]

StarTop then closed on the $5 million loan on March 15, 2023.[102] The loan was secured by deeds of trusts encumbering the interests of the entities that directly owned the Bakersfield Properties.[103] The loan cross collateralized the Bakersfield and Fresno Properties and aggregated the total loan amounts to $20.4 million.[104] Soberal signed pledge agreements for each of the Bakersfield Properties.[105] More

---

[98] JX 883.

[99] JX 885, 888.

[100] JX 888.

[101] JX 890, 891, 893. Soberal told Hardcastle that he had to "fund payroll personally[,]" to which Hardcastle responded "[a]lways fun being in charge." JX 902.

[102] JX 953.

[103] JX 949, 950, 951.

[104] JX 957.

[105] JX 963, 964, 965.

than half of the proceeds went to paying off the Patrick Loan, as well as interest and fees to StarTop.[106]

**H. NIC Wise Discovers Soberal's Fraud**

By May 2023, payments from Soberal to StarTop dried up. On Memorial Day weekend, NICbyte learned from a news article that Bitwise furloughed its employees and was shutting down.[107] NICbyte then ran a title search of the NIC Wise subsidiaries' properties and discovered the loans from StarTop and purported encumbrances.[108] NICbyte quickly filed suit in California Superior Court and obtained a temporary restraining order enjoining Soberal and his affiliated entities from disposing of or transferring the properties.[109]

StarTop took heed of NICbyte's actions against Bitwise and engaged in preemptive measures, setting the stage for this litigation. On May 30, Adler texted Hardcastle to "not communicate with [Soberal] in writing anymore . . . no text or email . . . We're in lawsuit mode and he can use against us."[110] On June 15, StarTop's counsel then sent a letter to NICbyte informing it of its election to transfer all assets and interests of the relevant entities to StarTop.[111] The next day, NICbyte's counsel

---

[106] JX 956.

[107] TT 409:10–18, 547:10–20.

[108] TT 547 (McCormick).

[109] JX 1079, 1126.

[110] JX 1081.

[111] JX 1127, 1128, 1129, 1130, 1131, 1132, 1133, 1134.

20

sent a document preservation notice to StarTop's California counsel ("Litigation Hold"). [112] As discussed in more detail below, the record shows that Adler and Hardcastle engaged in wide-ranging spoliation of critically important data after delivery of the Litigation Hold.

On June 28, 2023, BW Industries and Bitwise filed for Chapter 7 Bankruptcy in Delaware Bankruptcy Court. [113] Soberal and Olguin pled guilty to criminal charges of wire fraud and conspiring to commit wire fraud. [114] They are serving prison terms of eleven and nine years, respectively. [115] Adler and Hardcastle pled guilty to conspiracy to commit wire fraud. [116]

Altogether, Hardcastle and Adler contributed approximately $1.1 million to the StarTop loans and netted over $1.75 million. [117] But in addition to the fees they collected, they sought to collect on the loans to Bitwise by seeking to enforce the challenged loan documents.

---

[112] JX 1136.

[113] PTO ¶ 13.

[114] JX 1221, 1222.

[115] PTO ¶ 32.

[116] Dkt. 235, Ex. A, JX 1317. StarTop objects to the admissibility of the Hardcastle indictment, Adler's plea, and the hearing transcript from Hardcastle's detention hearing under D.R.E. 403 as "extremely prejudicial." Defendant StarTop Investments, LLC's Answering Post-Trial Brief at 14, 23, 40. But the Court does not rely on these for its analysis.

[117] See JX 736, 787, 789, 956, 958.

## I. StarTop Spoliates Evidence

On June 20, 2023, Plaintiffs NICbyte, NIC Wise, 1701 18th Street, LLC, 1715 18th Street, LLC, 1723 18th Street, LLC, and 747 R Street, LLC initiated this action against Defendants StarTop, Wishon Row, BW Industries and Bitwise. Plaintiffs sought declarations that the StarTop loan documents are void and unenforceable, and an injunction enjoining their enforcement. StarTop counterclaimed, seeking declaratory and injunctive relief to enforce the loans.[118]

A few weeks before trial, Plaintiffs moved for sanctions against StarTop due to spoliation of evidence. I heard oral argument on the motion on October 18, 2024. In light of the "unusual and troubling" evidence presented, the Court postponed the trial and appointed a Special Discovery Neutral to conduct an investigation.[119] After submission of the Special Discovery Neutral's report and supplemental submissions by the parties, the Court concluded that StarTop spoliated evidence.

The record of investigations into spoliation in this matter shows that software issues limited after-the-fact tracking of deletions. But even the limited audit trail data available shows deletion on a frankly vast scale. Beginning at the latest in mid-November 2023 (and almost certainly in the weeks and months before, as well),[120]

---

[118] The parties' sought-after relief has remained largely unchanged following trial.

[119] Dkt. 150, Ruling on Appointment of Special Discovery Neutral at 45:23–24.

[120] Transcript Rulings on Motion in Limine and Motion for Sanctions 22:8–15 ("I have basically zero confidence that no deletions occurred prior to November of 2023. The discovery neutral's report noted that Microsoft only introduced its Graph Activity Logs feature in October of 2023. This feature was responsible for providing users with access to action audits like the email deletion notifications.").

Adler and Hardcastle deleted Slack messages, text messages, emails and other deal room data dating from April 1, 2022 to January 25, 2024 ("Relevant Time Period").[121] With audit tracking capability commencing in November, the record confirms that deletions occurred in November and December 2023,[122] with the timing roughly coinciding with NICbyte's service of discovery requests and also around the time NICbyte filed its first motion to compel.[123]

Text messages between Adler and Hardcastle further show that they exchanged Slack messages during the period of August 2022 to March 2023.[124] This suggests they were active Slack users and that Slack messages would have been a vital source of information in this case. But their deleted Slack messages became non-recoverable 90 days after deletion.[125] Had Adler and Hardcastle complied with the Litigation Hold's instructions, deleted Slack messages exchanged after the second StarTop loan could have been recovered and available for use in this matter.[126]

---

[121] *See* Dkt. 153, Special Discovery Neutral's Report ("Report").

[122] *See* Dkt. 158, Affidavit of Andrew J. McClary in Support of Special Discovery Neutral's Report ("McClary Aff.") ¶ 48 (chart showing timeline of email deletions).

[123] *See* Dkts. 10, 13, 44.

[124] *See, e.g.*, JX 259 ("Check slack, just sent you a loan deal that is juicy[.]"), 502, 1013.

[125] McClary Aff. ¶ 17.

[126] *See* JX 1136 ("Your obligation is not merely to avoid deleting files, but to take affirmative steps to preserve relevant information and evidence, including making necessary back-ups and suspending any regular document or file destruction practices.").

As for other written communications, Adler deleted 101,979 text messages from the Relevant Time Period.[127] Hardcastle and Adler attempted to delete Dropbox files four times, including the falsified term sheet from the first StarTop loan.[128] And, Hardcastle did not preserve communications on his phone by reconfiguring retention settings after receiving the Litigation Hold.[129] Plaintiffs further showed prejudice by identifying key gaps in the documentary record that included a lack internal communications between Hardcastle and Adler as well as a lack of communications or documents concerning StarTop's diligence in executing the loans.

As an initial sanction, the Court shifted the burden of proof to StarTop on any claims or elements for which Plaintiffs had the burden of proof. It also raised the burden of proof on StarTop's claims or defenses to require a showing by clear and convincing evidence, which included the defense that Soberal had authority to enter into the loan documents.[130] The Court granted Plaintiffs' request for attorney's and

---

[127] McClary Aff. ¶ 25.

[128] *See* Report at 11 ("DLS [Discovery] identified four attempts to delete DropBox files: (a) an attempt on May 16, 2022 by Mr. Hardcastle to delete records; (b) the existence of 15 DropBox records in Mr. Adler's Recycle Bin (13 of which have been produced to NICbyte); (c) Mr. Adler's November 11, 2023 movement of Bitwise Term Sheet - Startop Investments (Bakersfield Trio signed) to Trash; and (d) Mr. Adler's October 10, 2023 movement of Bitwise Term Sheet - Startop Investments (final signed) to Trash.") (internal quotes omitted).

[129] McClary Aff. ¶ 24.

[130] Dkt. 190, Order Denying Defendant Startop Investments, LLC's Motion In Limine And Granting Plaintiffs' Motion For Sanctions Due To StarTop Investments, LLC's Spoliation Of Evidence ("Sanctions Order") ¶ 4; *see also Walker v. FRP Invs. GP, LLC*, 336 A.3d 542, 562 (Del. Ch. 2025) ("A party asserting an affirmative defense bears the burden of proof.") (citation omitted).

expert's fees and expenses. The Court reserved decision on whether to impose more severe sanctions based on the evidence presented at trial.

Plaintiffs submitted a Rule 88 affidavit related to their spoliation motion in support of their fees and expenses, totaling $423,781. StarTop opposed and submitted objections.

Trial took place on February 25–26, 2025. Counsel presented post-trial argument on June 18, 2025.

## II. ANALYSIS

Plaintiffs seek declarations that the pledge agreements, deeds of trust, and the StarTop loan documents are void ab initio and unenforceable on three separate grounds: they were procured by fraud and forgery, violate the JVA, and certificate of incorporation of BW Industries.[131] Further, they argue that, even if the loan documents are voidable, StarTop cannot meet its burden of proving actual or apparent authority.[132] Nor, so Plaintiffs argue, is StarTop entitled to enforce the loan documents under the doctrine of unclean hands and *in pari delicto*. Plaintiffs thus

---

[131] PTO ¶¶ 36, 107; *see* Dkt. 218, Plaintiffs' Opening Post-Trial Brief ("Pls. Opening Br.") at 33.

[132] PTO ¶ 49; *see* Pls. Opening Br. at 40.

seek, in part, an injunction against Defendants enjoining the enforcement of the loan documents.[133]

StarTop seeks mirror-image declaratory and injunctive relief. In relevant part, StarTop seeks declarations that the transfer of ownership interest in the NIC Wise subsidiaries and underlying property to StarTop are valid, that the underlying loan documents are valid and enforceable against Plaintiffs, that StarTop is the sole member of the NIC Wise subsidiaries, and that it has full right, title, interest and ownership in the underlying properties.[134] StarTop seeks in part injunctive relief requiring payment of all rents and revenues associated with the underlying properties, and all actions necessary to transfer control to StarTop of the properties.[135]

StarTop contends that the requisite authority existed for Soberal to enter into the loan documents to bind Plaintiffs, and that it was appropriately relying upon Section 6.1 of the JVA in deciding to undertake no further investigation into Soberal's representations of his authority. StarTop finally argues that the doctrine of unclean hands is unavailing because this doctrine cannot serve as defense where, according to StarTop, it is only bringing a legal claim—here, a single counterclaim for

---

[133] PTO ¶ 108.

[134] *Id.* ¶ 112.

[135] *Id.* ¶¶ 113–114.

declaratory judgment.[136]  In sum, StarTop believes that as a third-party beneficiary under Section 6.1 of the JVA, it is entitled to a declaration that the loan documents are enforceable.

Having considered the evidence, I need not address the entire tangle of arguments the parties raise here.  Even assuming that the documents at issue are not void,[137] the contemporaneous written record and the record of spoliation compel the Court to conclude that an adverse inference that Soberal did not have apparent authority to enter into the loans is warranted.  Furthermore, the Court finds that StarTop failed to meet its burden of proof that Soberal was authorized to enter into the loans.

---

[136] StarTop further adds that *in pari delicto* does not apply because such a doctrine only applies to parties "equally at fault."  *See* Dkt, 225, Defendant StarTop Investments, LLC's Answering Post-Trial Brief at 44.  StarTop attempts to walk back that it seeks equitable relief by insisting that its claims do not "sound in equity."  *Id*. at 42.  Even if the Court were to allow such a retreat, treating StarTop's posture as a purely legal one would result in a form of judicial "limbo" in which StarTop's interest in the relevant properties were upheld as valid but one in which it could not enforce in this court.

[137] *CompoSecure, L.L.C. v. CardUX, LLC,* 206 A.3d 807, 816–17 (Del. 2018) ("The common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and are subject to equitable defenses."); *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046 (Del. 2014) ("[t]he essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are *ultra vires,* fraudulent or gifts or waste of corporate assets.") (quoting *Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979)); *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch.), *aff'd*, 884 A.2d 512 (Del. 2005) ("Void acts are not ratifiable 'because the corporation cannot, in any case, lawfully accomplish them.'  Void acts are 'illegal acts or acts beyond the authority of the corporation.'  In contrast, voidable acts are ratifiable because the corporation can lawfully accomplish them if it does so in the appropriate manner.").

27

In reaching these conclusions, the Court finds that it is extraordinarily likely that StarTop's principals were aware that the security interests on the loans involved fraud and that Soberal was without authority to grant the interests. The notion that, in these circumstances, Soberal had assets worth millions of dollars on which to grant security interests, while requiring exorbitant-interest loans on short notice, is farcical.

Hardcastle and Adler would have known the security interests were fraudulent too. Hardcastle and Adler were aware of the requests for an unrecorded springing interest; they were aware that Soberal would likely violate the use of funds provision and simply pay back loans out of new loans. They saw the documents Soberal was providing showed forgery on their face, and they were aware Soberal was agreeing to sky-high interest rates on short notice, despite supposedly having gobs of cash on hand. And, taking a page from Soberal's own playbook, Hardcastle and Adler forged documents of their own to their own investors and looped Soberal in to assist.

The record of spoliation refutes StarTop's characterizations as a mere innocent third-party beneficiary. Soberal and Hardcastle were neighbors; Hardcastle told Adler they were in "lawsuit mode" after NICbyte commenced litigation against Soberal and sent its Litigation Hold; and after appointment of a Special Discovery Neutral, rafts of communications are still missing due to StarTop's intentional deletion of evidence.

StarTop's spoliation made it very difficult and expensive for Plaintiffs to put forward contemporaneous evidence of Hardcastle and Adler's communications showing what they knew and were thinking. Ultimately, however, the surviving

28

evidence and surrounding circumstances point directly at the conclusion that Hardcastle and Adler knew that Soberal lacked authority to enter into the loans with the security interests he purported to grant. The Court must, at a minimum, impose an adverse inference of knowledge here.

## A. StarTop Cannot Rely on Section 6.1 of the JVA

To show entitlement to its claims, StarTop styles itself as an innocent, third-party beneficiary invoking bargained-for provisions between NICbyte and Bitwise in the JVA. StarTop distances itself from the indisputable evidence of fraud and forgery by contending that they were products of Soberal and Bitwise's doing, not StarTop's, and that they do not strip StarTop of its rights and interests in the properties.[138] The crux of StarTop's arguments rests on Section 6.1 of the JVA. StarTop argues that under Section 6.1 it was "fully protected" in deciding to not engage in further inquiry of Soberal's representations of his authority. But StarTop's reliance on Section 6.1 of the JVA is untenable based on the evidence in the record and its misreading of the terms of the provision.

The JVA provides that:

[n]othing herein contained shall impose any obligation on any Person or firm doing business with the Company to inquire as to whether or not the Manager has exceeded its authority in executing any contract, agreement, lease, mortgage, note, guaranty, loan agreement, pledge, security agreement or other evidence of indebtedness, deed, assignment, conveyance or other transfer instrument or any other document or instrument of any kind or nature (each, a "Contract") on behalf of the

---

[138] For example, StarTop contends that, even if the BW Industries board consents were necessary to effectuate the loan transactions, the pledge agreements were not forged.

29

Company, and any third person shall be fully protected in relying upon Manager's confirmation of such authority.[139]

Several issues arise with StarTop's reading of this provision. First, StarTop treats the "fully protected" language as carte blanche to enter into contracts one knows are unenforceable or lacking in requisite authorization. That reading is frankly absurd and treats the provision as a fraud-free-for-all. Second, StarTop's reading is contrary to the surrounding text. Section 6.1 protects a third-party from having to "inquire as to whether or not the Manager has exceeded its authority[.]" But where the party already knows the Manager has no such authority, it makes no sense to speak of a duty to inquire into circumstances of which one is already aware.[140] On top of this, StarTop asks that the Court credit the testimony of witnesses that the Court found to be dubious and wholly lacking credibility, except perhaps for Adler's seemingly genuine remorse.[141] I therefore reject StarTop's attempt to employ Section 6.1 as a get-out-of-jail-free card.

I next address the claims that, even assuming that the underlying loan documents were not void, Soberal did not have actual or apparent authority to bind Plaintiffs.

---

[139] JVA § 6.1.

[140] *See* 12 Williston on Contracts § 35:69 (4th ed.) § 35:69 ("Apparent authority and its effect vanish in the presence of the third party's actual knowledge of the real scope.").

[141] *See, e.g.*, TT 345:9–486:8 (Hardcastle); TT 288:9–12 (Hardcastle); TT 289:23–290:7 (Hardcastle); TT 391:11–14 (Adler).

## B. Actual Authority

An agent may bind a principal either through actual or apparent authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[142]

Soberal, through Wishon Row, did not have actual authority to enter into the loan documents with StarTop. The JVA precluded Wishon Row from entering into a financing, pledging NIC Wise's interests, or encumbering its properties without the consent of NICbyte. Soberal did not obtain that consent.[143]

Unable to dispute this fact, StarTop instead argues that NICbyte's purported failure to pay a capital call wiped out any consent right it had and thus gave Soberal free reign to enter into contracts predicated on forgery and fraud. Specifically, and although StarTop has not shown it had any contemporaneous awareness of this, StarTop contends that NICbyte became a "Defaulting Member" under the JVA due to its asserted failure to make a required capital contribution.[144] Yet, even assuming for the sake of argument that StarTop has standing to make this contention on behalf

---

[142] *Harmon v. State, Delaware Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013) (quoting Restatement (Third) of Agency § 2.01 (2006)).

[143] JVA § 6.5(a).

[144] JVA § 3.4(a).

of Wishon Row, there is no evidence to suggest a default occurred.[145]  StarTop contends that Wishon Row submitted a capital call to NICbyte on October 3, 2022, that was distinct from prior capital calls.  But the capital call was instead the same capital call for September 26, 2022, that Wishon Row ultimately withdrew.[146]

In sum, the evidence, what little there is, does not show that NICbyte was in default. Instead, I conclude Soberal plainly lacked the express authority to enter into the loan documents.

## C. Apparent Authority[147]

I find that the record of spoliation warrants an adverse inference that there was no apparent authority.

---

[145] To reiterate, it is StarTop's burden to prove its defense.  Sanctions Order ¶ 4.c. ("On issues and claims for which StarTop already bears the burden of proof, StarTop must prove those issues and claims by clear and convincing evidence. This would include the following issues raised in the pleadings: . . . c. BW Industries, Inc. former co-CEO Jake Soberal . . . had actual authority to enter into the StarTop loans.").

[146] *See* TT 532:20–535:16 (McCormick); JX 374.  Further, the entity that supposedly made the call was managed by Soberal—a person with a proven record of fraud.  Soberal did not testify at trial, and there is no evidence StarTop ever knew about the supposed capital call.  I also note that StarTop claims the capital call was for tenant improvements, but even that is highly suspect given the debt needs Wishon Row was concealing.

[147] The Court's analysis moves directly to StarTop's arguments that Soberal had apparent authority, and summarily addresses StarTop's arguments of implied authority. First, StarTop waived any argument that Soberal had implied authority by not raising the argument in its post-trial briefs.  *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").  Its argument for actual authority related only to an argument based on express, not implied authority.  Second, and in any event, Plaintiffs quote from a Superior Court decision in *Wilson v. Active Crane Rentals, Inc.* that "the determination of implied authority depends on the relationship between the principal and agent, not what a third party believes about the relationship. That is, implied authority is authority that the agent reasonably believes he has as a result of the principal's actions." 2004 WL 1732275, at *2 (Del. Super. July 8, 2004).  Here, it was plainly not reasonable for Soberal to believe that NICbyte or Bitwise had in any way implied authorization to enter the

32

Apparent authority is a means "to bind a principal for acts of its agent in circumstances where the agent had no authority at all."[148] Apparent authority "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[149] "If a third party relies on this apparent authority in good faith and is 'justified in doing so by the surrounding circumstances,' the principal is bound to the same extent as if actual authority existed."[150]

Conversely, "[a]pparent authority ends when it is no longer reasonable for the third party with whom an agent deals to believe that the agent continues to act with actual authority."[151] A third-party "will not be permitted to claim protection if he ignores facts illustrating the agent's lack of authority."[152] "Apparent authority and its effect vanish in the presence of the third party's actual knowledge of the real scope

---

loan documents. If so, there would, for example, have been no reason for Soberal to falsify any board consents or the JVA.

[148] *Rudnitsky v. Rudnitsky*, 2000 WL 1724234, at *5 (Del. Ch. Nov. 14, 2000).

[149] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 799 (Del. Ch. 2014) (quoting Restatement (Third) of Agency § 2.03 (2006)).

[150] *Caribbean Sun Airlines Inc. v. Halevi Enters. LLC*, 339 A.3d 24, 35–36 (Del. 2025) (citation omitted).

[151] Restatement (Third) Of Agency § 3.11 (2006).

[152] *Vichi,* 85 A.3d at 799 (citing *Int'l Boiler Works Co. v. Gen. Waterworks Corp.,* 372 A.2d 176, 177 (Del.1977)); *Rudnitsky,* 2000 WL 1724234, at *6 ("It is an established principle of Delaware law that apparent authority cannot be asserted by a party who knew, at the time of the transaction, that the agent lacked actual authority.").

of the agent's authority, or knowledge of facts that would put the party on inquiry as to the actual authority of the agent."[153]

First, I note that there is no basis in the record to find that StarTop could have reasonably relied on Soberal's confirmations of his authority to enter into the loan documents. A reasonable person would have quickly suspected fraud in directly dealing with Soberal. Soberal's requests were always on short notice and urgent. And the rates he offered were unusually high. Of course, Soberal suggested a thin explanation for why he could not use the company's own cash—purportedly tens of millions of dollars—and instead needed to take out one short-term, very high interest loan after another. But that was beside the point, as Hardcastle lauded in a message to Adler: "[Soberal] always needs money. I think we'll be making fees off BW for many months to come."[154]

In addition, it became fairly obvious that Soberal was using the proceeds of the new short-term, high-interest loans to make payments on the old short-term, high-interest loans. Soberal paid off the First and Second 2112 Loans after receiving the proceeds from the Third 2112 Loan.[155] Soberal paid off two loans from Hardcastle and Adler once the Patrick Loan closed.[156] Then, more than half of the proceeds from

---

[153] 12 Williston on Contracts § 35:69 (4th ed.) § 35:69; *see also id.* § 35:70 ("[T]here is no apparent authority when a third party has knowledge of facts which would put it on inquiry as to the actual authority of the agent.").

[154] JX 584.

[155] JX 299.

[156] JX 468, 486, 491, 568.

the second StarTop loan went to paying off the Patrick Loan.[157] An undeniable pattern quickly emerged, in which Soberal would ask for more money only to make payments on money he had already borrowed. And, to ward off any suspicions and continue to attract investors, Hardcastle and Adler, in turn, added a "use of funds" clause despite knowing that it was a farce.[158] Indeed, when Soberal wanted the clause removed in the term sheet to investors, Hardcastle told Soberal: "[D]on't worry about that. We can't tell where it's going anyway. Just for our lenders in case they ask."[159]

Other developments would have raised alarms. Soberal insisted on not recording a deed of trust, or using a "balance sheet."[160] He wanted to conceal the security interest encumbering the Fresno Property, and at least based on the sparse record, never gave Hardcastle any clear explanation as to why—only conclusory statements that it added "complexity" to a sale of the real estate.[161] Patrick Investments' stark warning to "run away as fast as you can" was yet another extraordinary warning of the risks associated with Soberal.[162]

---

[157] JX 956.

[158] JX 591, 592.

[159] JX 591, 592.

[160] JX 258.

[161] JX 419.

[162] Although it did not ultimately deter Patrick Investments from entering into the loan on amended terms, it is worth noting that Patrick Investments had limited visibility of Soberal's side of the deal and was relying on Hardcastle's purported confidence in dealing

The documents that Soberal was forwarding, and that Hardcastle and Adler sent to third-party investors, were suspect too. Soberal sent forged BW Industries board consents that were electronically signed, but whose signatures were suspect. For the board consents authorizing the first StarTop loan, Soberal redacted the lines for the IP address and email address next to each director's name to conceal that he electronically forged their signatures.[163] And, in the board consents for the second StarTop loan, Soberal removed an audit trail altogether.[164]

On top of all this Hardcastle and Adler enlisted Soberal in fraudulent schemes of their own. Hardcastle and Adler misrepresented the loan terms to their own investors. Adler falsified and forged the term sheet and note. When investors began asking questions about the interest rate, Hardcastle and Adler included Soberal on a call specifically to justify and corroborate the falsely stated rate. Hardcastle and Adler in turn pocketed yet more fees, netting more than $1.75 million via their dealings with Soberal.

Thus, the evidentiary record, although heavily spoliated, shows that Soberal's statements and conduct would lead a reasonable person to question whether—and almost certainly conclude that—fraud was omnipresent. Not only that but

---

with him. Patrick Investments apparently sought security for the loan via the Bakersfield Properties and refused to continue with the deal unless the security interest was recorded.

[163] JX 694, 724.

[164] *See* JX 933.

Hardcastle and Adler were themselves engaged in fraudulent conduct for which they enlisted Soberal's help.

With such a record, it is a small step to infer that Hardcastle and Adler were aware of Soberal's lies. And yet, StarTop asks the Court to turn a blind eye to the mass spoliation that has occurred and conclude that StarTop was defrauded itself, even while engaging in fraud against others. Although StarTop destroyed a vast trove of documents preventing Plaintiffs and the Court from determining with precision what StarTop and its principals knew, given the stark absence and unavailability of evidence arising from StarTop's spoliation, on top of the unreliable testimony of StarTop's principals at trial, I am compelled to impose a further sanction in the form of an adverse inference.

The Court does not take this step lightly. Under Rule 37(e), the Court may "presume that [ ] lost information was unfavorable to the party" only if " the party acted recklessly or with the intent to deprive another party of the information's use in the litigation." [165] An adverse inference "is appropriate where a litigant intentionally or recklessly destroys evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the

---

[165] Ct. Ch. R. 37(e).

37

item."[166] The "known circumstances [must] reasonably admit" adopting "a view of the facts as unfavorable to the wrongdoer."[167]

When Plaintiffs first moved for sanctions, the Court was rightly troubled by the evidence of spoliation but believed a cautious approach was warranted. The Court imposed an initial burden-shifting and burden-raising sanction but deferred until after trial decision on whether additional sanctions were warranted. Although the Court weighed whether a default judgment was warranted based on the intentional destruction of evidence and resulting prejudice, here, the circumstances reasonably admit adopting the view that no apparent authority existed.[168]

First, StarTop's principals intentionally destroyed evidence in this action. Hardcastle and Adler knowingly deleted thousands of emails beginning *at least* by November 13, 2023, several months after receiving the Litigation Hold. The deletions coincided with NICbyte's service of discovery requests and motion to compel. Adler deleted more than 100,000 text messages during the Relevant Time Period that have not been recovered. And that includes at a minimum messages that became unrecoverable after receipt of the Litigation Hold and concerned the important time

---

[166] *Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1191 (Del. Ch. 2009) (citations omitted) (citing *Sears, Roebuck & Co. v. Midcap,* 893 A.2d 542, 552 (Del. 2006)).

[167] *Equitable Tr. Co. v. Gallagher*, 102 A.2d 538, 541 (Del. 1954).

[168] *See Goldstein v. Denner,* 310 A.3d 548, 557 (Del. Ch. 2024) ("To obtain a presumption or a default judgment, the requesting party must show that the responding party acted recklessly or with the intention of preventing another party from using the evidence in litigation.").

period following the second StarTop loan and around Bitwise's payment defaults.[169] Hardcastle and Adler further attempted to delete Dropbox files *four* times, including the falsified term sheet from the first StarTop loan.[170] Adler and Hardcastle communicated over Slack, but those messages are gone.[171] Hardcastle failed to preserve data on his mobile device by not reconfiguring his retention settings after he had received the Litigation Hold.[172] Hardcastle and Adler also likely deleted material information before November, and it is only due to software limitations that an audit trail of those deletions is unavailable.

Second, considering the limited documentary record that was preserved and StarTop's deficient and untimely productions, material gaps remain as to key fact questions—and those gaps are in great part intentional, not accidental. Indeed, Adler's directive to Hardcastle to "not communicate with [Soberal] in writing anymore . . . no text or email."[173] seems to have been taken a step further, with the intentional destruction of evidence continuing well after litigation began. Drawing an adverse inference here is thus appropriate and compelled by the circumstances.

---

[169] McClary Aff. ¶ 17.

[170] *See* Report at 11. To be clear, these documents were recovered. The Court discusses this particular (incompetent) attempt at spoliation to show that Hardcastle and Adler were intentionally destroying information, and indeed were successful with other data such as emails and texts.

[171] *See, e.g.*, JX 1009.

[172] *See* JX 1136 ("Your obligation is not merely to avoid deleting files, but to take affirmative steps to preserve relevant information and evidence, including making necessary back-ups and suspending any regular document or file destruction practices.").

[173] JX 1081.

The record of spoliation and cornucopia of red flags preceding the StarTop loan transactions compel an adverse inference against StarTop that Soberal did not have authority to enter into the StarTop loan documents, and that Hardcastle and Adler knew it.

Third and finally, the limited record that remains points to a conclusion that Hardcastle and Adler had actual knowledge of Soberal's lack of authorization to enter into the loans under the JVA. The JVA expressly prohibited Soberal from entering into the loan transaction without NICbyte's consent. Both the original and falsified JVA were in the possession of StarTop. Even a cursory review of them would have revealed the stark differences. The JVA was 45 pages and clearly revealed the identity of NICbyte in the opening recitals. The falsified one was shortened to five pages, and omitted NICbyte altogether. Furthermore, documentary evidence shows Adler understood, or at least told investors he understood, the importance of the JVA during the underwriting process. For example, on July 1, 2023, Adler wrote in an email to an investor that the JVA "has been on [StarTop's] radar since initial underwriting."[174]

To be clear, the finding that no apparent authority exists is ultimately predicated on the exercise of this Court's discretion to impose an adverse inference on sanctionable conduct arising from a vastly spoliated record. The Court need not determine exactly what StarTop's principals knew or did not know as to the provisions of the JVA. Based on the multiple indicia of fraud and spoliation from the

---

[174] *See* JX 1140.

record, it is sufficient to impose an adverse inference against StarTop that Soberal did not have apparent authority. Furthermore, StarTop has not shown that Soberal had actual authority.

Plaintiffs are entitled to their requested declaratory relief that the StarTop loan documents[175] are invalid and cancelled as they relate to any right to enforce against Plaintiffs or the underlying properties. Furthermore, StarTop has no right, title, or interest in the underlying properties,[176] nor any right, title, control or interest in NIC Wise or NIC Wise's subsidiaries.[177]

## D. Injunctive Relief

Although Plaintiffs did not brief their requests for relief, because of the original spoliation ruling, StarTop bore the burden as to claims or elements for which Plaintiffs initially had the burden of proof.[178] With that in mind, I consider whether to grant Plaintiffs' requested injunctive relief.

---

[175] *See* PTO ¶ 107(b) ("The January 13, 2023 and March 15, 2023 Promissory Notes, the loan modification cross-collateralizing the loans and upsizing the principal amount, Pledge Agreements, the Deeds of Trust on the Plaintiff Subsidiaries' Properties located at 1701 18th Street, Bakersfield, CA 29 93301, 1715 18th Street, Bakersfield, CA 93301, 1723 18th Street, Bakersfield, CA 93301, 747 R Street, Fresno, CA 93721, and any other loans, promissory notes, deeds of trust, or pledge agreements whose existence and validity is alleged by StarTop or its affiliates regarding NIC Wise, the Plaintiff Subsidiaries, or the Properties").

[176] *Id.* ¶ 107(c) ("(i) 1701 18th Street, Bakersfield, CA 93301; (ii) 1715 18th Street, Bakersfield, CA 93301; (iii) 1723 18th Street, Bakersfield, CA 93301; and (iv) 747 R Street, Fresno, CA 93721").

[177] *Id.* ¶ 107(d).

[178] *See* Sanctions Order ¶ 3.

41

Plaintiffs ask the Court to permanently enjoin Defendants from "interfering in Plaintiffs' operation or business in any way," "asserting any rights or interests supposedly derived from the fraudulently obtained and void loans, promissory notes, deeds of trust, pledge agreements, or other accompanying loan documents to any other person or entity, or in any other proceeding," and "demanding substitution of Duane Morris LLP as Plaintiffs' counsel in any capacity or matter, or in any way interfering with Duane Morris LLP's representation of Plaintiffs."[179]

"A permanent injunction is a form of final relief that prohibits a party from taking action or compels a party to take action."[180] To obtain a permanent injunction, a party ordinarily must show "(i) actual success on the merits; (ii) that it would suffer irreparable harm if the injunction is not granted; and (iii) that the balance of the equities favors it."[181] The remedy requires a showing that other remedies are inadequate.[182]

Plaintiffs seek prohibitory injunctive relief. StarTop did not directly address Plaintiffs' entitlement to injunctive relief (or lack thereof) or elements (ii) and (iii) of the analysis. Instead, StarTop sought to prove Plaintiffs' lack of success on the merits, which the Court addresses above. Accordingly, any arguments by StarTop as to

---

[179] PTO ¶ 108.

[180] *Glob. Cap. Partners LLC v. Green Sapphire Holdings, Inc.*, 2026 WL 709819, at *45 (Del. Ch. Mar. 13, 2026).

[181] *In re COVID-Related Restrictions on Religious Servs.*, 326 A.3d 626, 640 (Del. 2024)) (quotation omitted).

[182] *Glob. Cap. Partners LLC*, 2026 WL 709819, at *45.

irreparable harm or balancing of the equities are waived or otherwise fail consistent with the Court's prior spoliation order. Plaintiffs are plainly entitled to their requested permanent injunctive relief consistent with this decision.

**E. Rule 88 Affidavit in Relation to Plaintiffs' Spoliation Motion**

This Court granted Plaintiffs' request for "fees and expenses . . . related to the [spoliation motion,] . . . including expert fees, [and those from] drafting the original motion papers and reply brief, in connection with the hearings on October 18, 2024 and February 18, 2025, the supplemental briefing, and the Special Discovery Neutral's investigation."[183] StarTop opposes Plaintiffs' request for fees on two grounds: the billable rate of one of Plaintiffs' counsel's associates, and Plaintiffs' forensic expert's fees incurred after the spoliation hearing on October 14, 2024. StarTop also objects to billing entries that it contends are outside of the scope of the Court's order.

In reviewing a fee application, Delaware courts "evaluate the reasonableness of fees under the standards of Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct."[184] "When awarding expenses as a contempt sanction or for bad faith litigation tactics, this Court takes into account the remedial nature of the

---

[183] Sanctions Order ¶ 5.

[184] *Carpenter v. Dinneen*, 2008 WL 2950765, at *1 (Del. Ch. July 3, 2008).

43

award."[185] "Determining reasonableness does not require that this Court examine individually each time entry and disbursement."[186]

Having considered the Rule 1.5(a) factors and the scope of the order,[187] I conclude that the requested fee award is reasonable. The billable rate of the identified associate is not unreasonable given the associate's experience and relative to the other (discounted) rates of counsel in this action. It was also not unreasonable for Plaintiffs to engage the services of a forensic expert after the October hearing given the initial evidence of spoliation. The expert provided additional services to the Discovery Expert Neutral in helping frame the scope of the investigation, and he further assisted Plaintiffs' counsel in analyzing the information and data untimely produced by StarTop.

Although StarTop does not identify the specific time entries it challenges, each objection it raises relates to an entry that was either incurred as a result of or in connection with the spoliation motion, related hearings, the supplemental briefing, or the Special Discovery Neutral's investigation. To be clear, Plaintiffs' fee request

---

[185] *Aveta Inc. v. Bengoa,* 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010).

[186] *Lynch v. Gonzalez*, 2020 WL 5587716, at *2 (Del. Ch. Sept. 18, 2020), *judgment entered*, (Del. Ch. 2020), *aff'd*, 253 A.3d 556 (Del. 2021).

[187] Del. Lawyers' R. Prof'l Conduct 1.5(a) ("(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.").

44

for $423,781 is not a paltry sum. But in light of the wide-ranging evidence of spoliation, StarTop's counsel's failure to account for the full extent of that spoliation in the October hearing and the subsequent investigation, Plaintiffs' fee request here is not unreasonable. Accordingly, StarTop shall pay $423,781 in fees and expenses to Plaintiffs within 30 days.[188]

## III. CONCLUSION

The parties are asked to submit a stipulated form of order implementing this decision within ten business days and to submit a joint letter advising the Court of any issues that may remain to be addressed.

---

[188] Plaintiffs are entitled to no other award of fees and expenses, whether for sanctions or under any enforceable fee-shifting provision. As to sanctions, the sanctions awarded are enough. Ironically, Plaintiffs also seek to shift fees under the pledge agreements that they are seeking to declare unenforceable. They cannot have it both ways. Their request for fee and expenses apart from the spoliation motion is denied.